Robert Tauler (SBN 241964)
rtauler@taulersmith.com
Narain Kumar (SBN 301533)
nkumar@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (310) 590-3927

*Attorneys for Plaintiff*
*Clark Santoro*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLARK SANTORO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLOOMBERG L.P., and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-02014-RGK-AJR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 631)** |

**JURISDICTION**

1. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen of a different State or subject of a foreign state.

2. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

3. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and the injury to Plaintiff occurred within this District.

**PARTIES**

4. Plaintiff Clark Santoro ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.

5. Defendant Bloomberg L.P. ("Defendant" or "Bloomberg") is a New York limited partnership that owns, operates, and/or controls www.bloomberg.com ("Website"), one of the world's leading financial information platforms.

6. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants

sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

7. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## FACTUAL ALLEGATIONS

### A. Defendant and its Website.

8. Bloomberg L.P. is one of the world's largest financial information and media companies, generating over $12 billion in annual revenue. Its Website, www.bloomberg.com, receives hundreds of millions of visitors annually who rely on it for market research, investment strategies, and financial analysis.

9. The Website's core value proposition is providing users with sophisticated financial research tools and market data. Central to this is the Website's search functionality, which allows users to search Bloomberg's vast repository of financial information, analysis, and proprietary data.

### B. Defendant's Website's Search Function.

16. Defendant has embedded multiple third-party tracking technologies into its Website that serve to deanonymize and profile individuals who visit the Website. These tracking technologies are particularly focused on capturing and sharing users' search queries, which often reveal sensitive financial research, investment strategies, and personal financial planning information.

17. The Website's search functionality appears to users as a simple search box where they can enter queries to find financial information. However, technical analysis

reveals that the Search Bar's actual implementation serves a dual purpose: helping users locate relevant financial information while simultaneously capturing users' private searches and transmitting them to third-party tracking companies who build detailed profiles of Website visitors.

18. When a user interacts with the Search Bar, a sophisticated tracking sequence activates without the user's knowledge or consent. The moment a user enters a search query like "personal finance," and before any search results are displayed, multiple third-party tracking systems simultaneously capture both the search terms and extensive technical data about the user's device and browser.

19. The Search Bar enables these entities to capture users' specific searches through the following technical process:

20. When a user inputs a query into the Search Bar and clicks "search," a results page appears. The URL of this search results page contains the user's search terms. In this case, when Plaintiff submitted the query "personal finance," the following URL was generated: "https://www.bloomberg.com/search?query=personal%2520finance" (the "SUBJECT URL").

21. The SUBJECT URL and corresponding search query are then simultaneously transmitted to multiple third-party tracking services through code embedded by Defendant. Technical evidence shows this data was captured by at least six different third-party entities:

a. LinkedIn's advertising platform
b. Facebook's tracking pixel
c. Google/DoubleClick's ad network
d. Microsoft Bing's advertising system
e. Parse.ly analytics
f. Additional tracking services

22. Each of these third parties operates sophisticated tracking systems. For example, LinkedIn's advertising platform (px.ads.linkedin.com) allows businesses to track

user behavior across websites and build detailed profiles for ad targeting. Similarly, Facebook's pixel system enables cross-site tracking and user profiling for advertising purposes.

23. These third parties obtain the contents of search queries by sending "GET" requests to intercept communications between users and the Website. For instance, the HAR file shows LinkedIn's system sending a GET request with parameters including "pid=403593" and capturing the search query along with extensive technical data about the user's device.

24. In response to these GET requests, the Website provides the third parties not only with the search terms but also with detailed technical data that can uniquely identify users, including:

a. Screen resolution (documented as 1280x720)
b. Browser specifications (Chrome v130)
c. Operating system details (Windows)
d. Unique tracking identifiers
e. Network connection data

25. The third parties then correlate the captured search terms with their existing profiles and tracking data, enabling them to associate specific individuals with their private financial searches. This creates detailed profiles of users' financial interests, investment research, and market analysis activities.

26. This entire process occurs instantaneously. At no point is the user notified that their search terms and device data are being intercepted and transmitted to multiple third parties.

27. Defendant's failure to obtain explicit consent for these interceptions and transmissions violates CIPA. Most users would be shocked to learn that their private financial research and investment-related searches are being captured by multiple third parties and used to build detailed profiles about their financial interests and activities.

28. The sensitive nature of financial searches on Bloomberg's Website makes this unauthorized interception particularly egregious. Users reasonably expect their searches for market research, investment strategies, and financial planning information to remain private, not to be captured and monetized by multiple third-party tracking companies.

**C. <u>Plaintiff's Experience</u>.**

29. Plaintiff visited Defendant's Website, www.bloomberg.com, on October 23, 2024 using a personal desktop computer for the legitimate purpose of researching financial markets and investment strategies. From the outset, Plaintiff believed the Website—widely regarded as a premier source of finance-related news and analysis—would provide a confidential environment for exploring personal financial questions.

30. Shortly after arriving on the Website, Plaintiff typed "personal finance" into the Search Bar. This query carried personal significance, touching on future investment decisions and financial well-being. In no way did the interface or user instructions suggest that typing a query would trigger an immediate and widespread broadcast of this information to external entities.

31. Unbeknownst to Plaintiff, the Website contained code that, the moment Plaintiff clicked the "search" button, began transmitting Plaintiff's search term—"personal finance"—to multiple third-party platforms, along with identifying details about Plaintiff's device and browsing session. Only through a subsequent analysis of the HTTP Archive ("HAR") file did Plaintiff discover the hidden mechanism by which the Website effectively "wired" Plaintiff's private query to a network of corporate recipients. The analogy is akin to writing a discreet letter detailing one's finances, only to have the letter scanned and copied to advertisers, data brokers, and analytics firms before it even leaves the mailbox.

32. The chart below provides a concise view of which third parties received Plaintiff's query and precisely what was shared:

| Company | Type of Entity | Data Received |
|---|---|---|
| LinkedIn | Advertising & Analytics Platform | - **Search Query**: "personal finance"<br>**URL**:https://www.bloomberg.com/search?query=personal%2520finance<br>**Browser/OS Info**: Chrome v130 (Windows<br>**Screen Resolution**: 1280×720<br>**Unique IDs**: pid=403593 etc |
| Facebook | Social Media / Tracking Pixel | **Search Query**: "personal finance<br>**URL**:<br>https://www.bloomberg.com/search?query=personal%2520finance<br>**Browser/OS Info**: Chrome v130 (Windows<br>**Screen Resolution**: 1280×720<br>**Unique IDs**: id=227995338998622,<br>fbp=fb.1.1729713353270 |
| Google/DoubleClick | Advertising & Analytics Network | - **Search Query**: "personal finance"<br>**URL**:<br>https://www.bloomberg.com/search?query=personal%2520finance<br>**Browser/OS Info**: Chrome v130 (Windows)<br>**Screen Resolution**: 1280×720<br>**Unique IDs**: gcd=13t3t3t3t5l1,<br>auid=1554501659.1729713354<br>**Referrer**: https://www.bloomberg.com/ |

| Company | Type of Entity | Data Received |
|---|---|---|
| Microsoft Bing | Advertising & Analytics | **Search Query**: "personal finance<br>**URL**:<br>https://www.bloomberg.com/search?query=personal%2520finance<br>**Browser/OS Info**: Chrome v130 (Windows)<br>**Screen Resolution**: 1280×720<br>**Unique IDs**: ti=5820275, mid=6bab992e-9e4e-4d28-a9ca-b0961d9f9011 |
| Parse.ly | Web Analytics Provider | - **Search Query**: "personal finance"<br>**URL**:<br>https://www.bloomberg.com/search?query=personal%2520finance<br>**Browser/OS Info**: Chrome v130 (Windows)<br>**Screen Resolution**: 1280×720<br>**Unique IDs**: plid=bcce014b-b321-4215-b31d-45791fb18bee, pvid=79a1e495-4a55-4049-8cb6-127dbda22707 |

33. Examining these transmissions in the HAR file reveals how the Website's embedded tracking code sent out "GET" requests containing the query ("personal finance") and device identifiers at the exact moment Plaintiff pressed "search." This occurred before any search results were rendered, indicating Plaintiff's private request was intercepted and rerouted without Plaintiff's knowledge or consent—comparable to a phone conversation that is tapped and recorded the instant the call begins. None of this was disclosed to Plaintiff in real time, nor did Defendant provide any opportunity to opt out. Had Defendant

requested such consent before Plaintiff inputted his query into the Search Bar, Plaintiff would have declined.

34. What makes this particularly troubling is that the query, "personal finance," is imminently tied to Plaintiff and any other search on the site would similarly deal with personal financial services. The third parties, armed with that knowledge and the unique markers of Plaintiff's device, can match these newfound insights to larger profiles they maintain. This seamless merging of a personal financial query with broader online behavior opens the door to unwanted targeting, data exploitation, or even discriminatory practices. If, for instance, a data broker learns that a user is concerned with certain types of personal finance, that user can be flagged for higher-interest financial products or singled out for aggressive marketing campaigns—an intrusion reminiscent of strangers peeking into one's bank statements without permission.

35. Plaintiff had no reason to suspect these embedded transmissions because the Website gave no visible indication of handing off data to outside trackers. The average user, lacking sophisticated technical expertise, would be entirely in the dark. Only by conducting a thorough technical analysis could Plaintiff discover the silent hand-off of private search data.

36. In essence, Plaintiff approached Defendant's Website in search of reliable financial insights, expecting the transaction to be between Plaintiff and Defendant alone. Yet, behind the scenes, the Website was engineered to intercept and disseminate each query across a web of third parties. This conduct not only undermined Plaintiff's core expectation of privacy but also facilitated the creation of persistent digital records of Plaintiff's personal search. Under the California Invasion of Privacy Act ("CIPA"), intercepting private communications without explicit, prior consent is a serious violation, especially where the communication relates to personal finances.

37. Because of specific code in Defendant's Website parameters are inserted into the request payload, Defendant's servers receive them before they return any personalized content, so the company can immediately bucket the user by state or city. Defendant also

bypasses any server-side IP masking you might try at the edge. Defendant thus knows Plaintiff's geographic location the instant Plaintiff visits the Website.

38. Every HTTPS request in the HAR (to Bloomberg assets, Google, LinkedIn, etc.) necessarily includes the client's source IP at the TCP layer. Even if none of the relevant query-string fields were present, each vendor receiving the request can run its own GeoIP lookup and determine that the address geolocates to California (often down to the ZIP-code level).

39. By surreptitiously exporting Plaintiff's search terms, the Website inflicted a real and ongoing harm, exposing Plaintiff's sensitive financial interests to commercial exploitation and potential misuse—harms for which Plaintiff now seeks appropriate redress.

## <u>CLASS ALLEGATIONS</u>

40. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class Members") defined as follows:

> **All persons within California whose search queries on Defendant's Website were intercepted and transmitted to third parties without consent.**

41. <u>NUMEROSITY</u>: The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. The identity of Class Members is ascertainable through Defendant's records or by public notice.

42. <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class Members. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant intercepted and transmitted Class Members' search queries to third parties;

b. Whether Defendant obtained consent before intercepting and transmitting these search queries;

c. Whether website search queries constitute "communications" under CIPA;

d. Whether Defendant's actions violate CIPA;

e. Whether Class Members are entitled to statutory damages under CIPA.

f. Whether Class Members are entitled to injunctive relief.

g. Whether Class Members are entitled to disgorgement of data shared with third parties.

43. <u>TYPICALITY</u>: Plaintiff's claims are typical of the claims of the Class Members, as they are all based on the same factual and legal theories.

44. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

45. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. The class action mechanism is particularly appropriate in this case due to the uniformity of Defendant's conduct across all users and the technical nature of the evidence required to prove the violations. Individual actions would be prohibitively expensive and could lead to inconsistent results, undermining the purpose of CIPA to protect Californians' privacy rights consistently.

**FIRST CAUSE OF ACTION**

**Violations of the California Invasion of Privacy Act**

**Cal. Penal Code § 631**

**(Aiding and Abetting)**

46. CIPA, specifically section 631(a) of California's Penal Code, imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or (4) who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

47. Defendant aids and abets violations of CIPA by knowingly providing substantial assistance to third parties in their unauthorized interception of Website users' private communications. Defendant intentionally embeds third-party tracking code on its Website that enables these companies to intercept and capture users' search queries while facilitating the transmission of detailed identifying information alongside these queries. Through careful architectural design of its Website, Defendant ensures these third parties can automatically capture private search queries through various technical means including GET requests. Defendant not only provides these third parties with detailed technical specifications about how to capture and process the intercepted communications, but also maintains ongoing business relationships with them knowing they will use the intercepted

communications for commercial purposes. This systematic enabling of third-party interception forms the basis of Defendant's aiding and abetting liability under CIPA.

48. Defendant's interception and transmission of users' search queries to third-party entities as detailed herein constitutes an unauthorized interception and learning of the contents of a communication while in transit, in violation of CIPA.

49. Specifically, the GET requests used to capture users' search queries constitute "interception" under CIPA because they actively extract and read the contents of communications while in transit, operating in a manner analogous to traditional wiretapping technology.

50. Courts have recognized that the content of search queries is private and protected under CIPA. Defendant's interception and transmission of users' search queries to third-party entities as detailed herein constitutes an unauthorized interception and learning of the contents of a communication while in transit, in violation of CIPA.

51. CIPA imposes civil liability and statutory penalties for violations of CIPA Cal. Penal Code. § 637.2.

52. Therefore, Plaintiff and Class Members are entitled to injunctive relief and statutory damages under California Penal Code § 637.2 and the equitable relief prayed for herein.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class and naming Plaintiff as representative and his attorneys as Class Counsel to represent the Class Members;
2. An order enjoining Defendant's conduct as alleged herein and ordering disgorgement of data acquired by data sharing with the DATA COMPANIES;
3. Statutory damages of $5,000 for Plaintiff and each Class Member for each violation of CIPA;

4. An order requiring Defendant to disgorge and delete all unlawfully obtained search query data;
5. Pre-and post-judgment interest on any amounts awarded;
6. An award of costs and expenses of this action, including reasonable attorneys' fees and expert fees;
7. Punitive damages; and
8. Such other and further relief as the Court deems just and proper.

DATED: May 5, 2025 **TAULER SMITH LLP**

By: */s/ Robert Tauler*
Robert Tauler, Esq.
*Attorneys for Plaintiff*
*Clark Santoro*

## DEMAND FOR JURY TRIAL

Plaintiff Clark Santoro hereby demands a trial by jury.

DATED: May 5, 2025 **TAULER SMITH LLP**

By: */s/ Robert Tauler*
Robert Tauler, Esq.
*Attorneys for Plaintiff*
*Clark Santoro*